IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
-------------------------------------------------------------X
ROBERT CARTER,

      Plaintiff,

v.

WAL-MART STORES, INC.; WAL-MART STORES
EAST, LP; JOHN MURPHY in his official capacity as
HUMAN RESOURCES MANAGER; MATTHEW
MIKESELL in his official capacity as ASSET
PROTECTION MANAGER; and SHANNA KANAPS
in her official capacity as OPERATIONS MANAGER,

      Defendants.
-------------------------------------------------------------X

DOC NO
REC'D/FILED
2017 MAR 30 AM 10: 30
PETER OPPENEER
CLERK US DIST COURT
WD OF WI

**COMPLAINT**

**JURY TRIAL DEMANDED**

17 C 246

## NATURE OF THE ACTION

This is an action pursuant to the Fair Labor Standards Act of 1938 (as Amended) to correct unlawful employment practices based on retaliation and to provide appropriate relief for Robert Carter, ("Plaintiff") who engaged in a protected activity and suffered adverse employment actions because of the unlawful practices. Plaintiff alleges that the Defendants, Wal-Mart Stores, Inc., and Wal-Mart Stores East, LP, by and through Defendants John Murphy; Matthew Mikesell and Shanna Kanaps (collectively, "Defendants") in their official capacities violated the Fair Labor Standards Act ("FLSA") by retaliating against Plaintiff after Plaintiff informed John Murphy that Plaintiff had filed a discrimination complaint with respect to violation of Wisconsin law; suspending Plaintiff in response and subsequently terminating Plaintiff.

## JURISDICTION AND VENUE

1. Jurisdiction of this court is invoked pursuant to 28 U.S.C. § 451, 1331, and 1337. This action is authorized and instituted pursuant to Section 215 (a)(3) of the Fair Labor Standards Act.

2. The employment practices hereafter alleged to be unlawful were committed within the jurisdiction of the Western District of Wisconsin.

## PARTIES AND OTHER PERSONS

3. Plaintiff, Robert Carter was an employee at the Walmart Distribution Center in Menomonie, Wisconsin as an Orderfiller in Case Lot on the Second Shift.

4. At all relevant times, Wal-Mart has continuously been and is now a corporation doing business in the Eastern District of Wisconsin and the city of Menomonie, Wisconsin, and has continuously had and does now have at least five hundred (500) employees.

5. At all relevant times, the Wal-Mart Distribution Center #6025 Center located at 6100 3M Drive in Menomonie, WI was and remains owned by Wal-Mart Stores East, LP, a wholly owned subsidiary of Wal-Mart Stores, Inc.

6. At all relevant times, John Murphy was and currently serves as the Human Resources Manager at the Wal-Mart Distribution Center located at 6100 3M Drive in Menomonie, WI and has been employed by Wal-Mart for 25 years or more.

7. At all relevant times, Matthew Mikesell was and currently serves as the Asset Protection Manager at the Wal-Mart Distribution Center located at 6100 3M Drive in Menomonie, WI and has been employed by Wal-Mart for 10 years or more.

8. At all relevant times, Shanna Kanaps was the Operations Manager in the Case Lot Division at the Wal-Mart Distribution Center located at 6100 3M Drive in Menomonie, WI and has been employed by Walmart for 10 years or more.

9. At all relevant times, Wal-Mart has continuously been and is now an employer engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 215(a)(3).

10. At all relevant times, Wal-Mart has been and is now a covered entity under 29 U.S.C. § 215(a)(3).

## STATEMENT OF CLAIMS

11. On March 8, 2017, Plaintiff filed a complaint of discrimination with the Equal Rights Division of the Wisconsin Department of Workforce Development alleging violations of the Wisconsin Fair Employment Law, Sections 111.31-111.397.

12. On March 13, 2017, the Equal Rights Division accepted the complaint and on March 15, 2017 notified the Defendants of the complaint.

13. On March 10, Plaintiff filed a complaint of discrimination with the Equal Rights Division of the Wisconsin Department of Workforce Development alleging retaliation after Plaintiff was suspended from his employment in violation of the Wisconsin Fair Employment Law, Sections 111.31-111.397.

14. On March 13, Plaintiff filed a complaint of discrimination with the Equal Rights Division of the Wisconsin Department of Workforce Development alleging retaliation after Plaintiff was terminated from his employment in violation of the Wisconsin Fair Employment Law, Sections 111.31-111.397.

15. In 2006 and 2010, Plaintiff was convicted of felony crimes in the United States District Court for the Southern District of New York, both of which combine to create a "conviction record" which is a protected class under § 111.31-111.397 of the Wisconsin Fair Employment Act.

16. Plaintiff, a first- year law school student, took care to understand the conviction disclosures in Wisconsin prior to applying for employment at Wal-Mart and took care that any position Plaintiff applied for would not be substantially related to the convictions.

17. In or about December 2016, Plaintiff completed research of the available jobs at Wal-Mart and concluded that the job of Orderfiller, 2nd Shift in Case Lot would be an appropriate job because disclosure of the convictions would have less of an impact in the review process and Plaintiff's chances for employment would be increased. Plaintiff applied for the Orderfiller Case Lot Opportunity.

18. On or about December 13, 2016, Plaintiff was scheduled for an interview at the Wal-Mart Distribution Center with Ronald Hager.

19. During the interview, Hager informed that the Orderfiller job was very "physical" and that it was very different from the experience that Plaintiff had on his resume. Hager then took Plaintiff onto the floor of the Distribution Center and showed Plaintiff what he would be doing as an Orderfiller.

20. Hager explained that Plaintiff would essentially be throwing cases onto a conveyor belt and that these cases weighed anywhere from 1 to 75 pounds and could weigh more. Hager further explained that Plaintiff would have to place labels on the cases after throwing them onto the conveyor belt. Hager finally explained that Plaintiff would be scheduled to work from 3pm to 1am.

21. Hager and Plaintiff then went back to Hager's office where Hager asked Plaintiff if this job was something that he was interested in given his previous experience. Plaintiff responded that he was interested and would like to continue the process. Hager then scheduled a Physical Abilities Test (PAT) the following week.

22. The following week, Plaintiff returned to the Distribution Center for the PAT. Hager met Plaintiff and both went to Hager's office. Hager explained what the PAT would entail and explained that before the PAT, Plaintiff would watch a few short videos, do a few stretch techniques and then the PAT.

23. Hager explained that the PAT was timed and that there were three parts to the test. First, Plaintiff would carry crates that contained weights from 25 to 75 pound. These crates would be placed on flat surfaces from lowest to highest and then from highest to lowest format. Second,

Plaintiff would do an arm exercise for a specified amount of time. Finally, the Plaintiff would do as many sit-ups as possible in the time allotted.

24. Plaintiff then watched the short videos, signed a waiver and proceeded to take the PAT. While taking the PAT, Plaintiff followed the instructions of Hager as given and completed all three timed parts of the PAT.

25. When the PAT was completed, Hager then explained that the results process was straight forward. Hager explained that he would input the PAT results into a computer model and it would provide a result of either competitive or not competitive. Hager and Plaintiff proceeded back to Hager's office.

26. In Hager's office, Hager remarked, "based on what I have seen, you should be competitive, I have seen worse who were found competitive." Hager then said, "would you like the job?" Plaintiff responded, "Yes, I would." Hager then explained that Plaintiff would receive an email shortly stating that he was found to be competitive. Hager then provided Plaintiff with a Drug Screen Analysis form and advised Plaintiff to complete the drug screen test within five business days.

27. Hager then explained that Plaintiff would have to undergo a background check that would include a criminal background check. Hager further explained that Plaintiff would receive an email from the third party asking Plaintiff to authorize the background and criminal background check. Hager further explained that once the process was complete, he would receive an email that would inform him if Plaintiff was competitive or not competitive.

28. Plaintiff then left Hager's office and proceeded to the Drug Analysis test sight and completed the test. Upon leaving the test center, Plaintiff received an email from Walmart stating that Plaintiff had been found competitive and would receive a follow-up email about the background check.

29. About 10 minutes later, Plaintiff received an email which congratulated Plaintiff on being offered conditional employment with Wal-Mart. The email further asked Plaintiff to sign into the website of Sterling Infosystems and consent to a criminal background check. Plaintiff proceeded to the Sterling website and authorized the criminal background check.

30. Upon registering to the Sterling website for authorizing the background check, Plaintiff was asked on the site if he had been convicted of a crime. Plaintiff checked the box for yes.

31. In or about one week after authorizing the criminal background check, Plaintiff received a follow-up email from Sterling Infosystems which advised Plaintiff that he should contact Sterling within five business because Sterling needed additional information about the convictions that Plaintiff had disclosed in the criminal background authorization.

32. Immediately, Plaintiff called the number provided in the email and contacted Sterling. Upon reaching a representative, the representative stated that more information was needed about

the convictions that Plaintiff had disclosed. The representative asked Plaintiff two questions: (1) "what is securities fraud exactly?" and (2) what other convictions are there if any?

33. Plaintiff then explained to the representative what securities fraud was and explained to her the circumstances of the conviction. Plaintiff then told the representative that he had a 10-year old conviction. The representative then asked what those convictions were, exactly when did they occurred and the circumstances surrounding them.

34. Plaintiff explained that the two 2006 convictions for wire fraud and intent to commit access device fraud were combined for the purposes of sentencing under the same docket number. The representative asked what access device fraud was and Plaintiff explained that it was a legal term for credit cards and that unauthorized credit card were taken from one state into another state.

35. The representative then stated that this was all the information needed and that Sterling would conduct its own criminal case search to confirm what Plaintiff had told her. She explained that Plaintiff should continue to sign into the Associate Background Screening System (ABBS) to check his status. Plaintiff thanked the representative and the call ended.

36. On January 11, 2017, Plaintiff received a letter from Sterling Infosystems which included the actual background check that it had completed on Plaintiff. The background check report revealed both the 2006 convictions and the 2010 conviction as Plaintiff had explained them to the representative. Sterling had also included the findings of its own criminal case search which reflected the 2006 convictions just as Plaintiff has explained it.

37. Plaintiff signed into the ABBS to check the status of his eligibility for employment and in the ABBS, Plaintiff was found to be "eligible for hire."

38. On January 18, 2017, Plaintiff received a call from Tammy in the Personnel Office at the Wal-Mart Distribution Center. On that call, Plaintiff was informed that he would begin the "onboarding" process on January 25, 2017. Onboarding is Wal-Mart's process to welcome new employees and is was a two-day process for the Plaintiff.

39. On January 25, 2017, Plaintiff arrived for onboarding and completed the process. Plaintiff begin working his shift on the same date.

40. During the shift, Plaintiff was assigned to a Trainer, Scott who is a fellow associate in the Case Lot division. Scott was required to train Plaintiff and assist Plaintiff in learning the job responsibilities that would be required in the Case Lot division of the warehouse.

41. A tour of the warehouse facility was the first action that Scott took in training Plaintiff. As Scott and Plaintiff were walking around the warehouse facility, Plaintiff and Scott engaged in a general conversation about general topics.

42. Plaintiff and Scott discussed their political views, the impact of the 2016 election, matters related to the economy such as the federal reserve and how the stock market impacts business. Plaintiff and Scott also had a conversation that touched upon the history of the Plaintiff,

for example, where Plaintiff went to school and the various experiences that Plaintiff had. A discussion about the children of each of Plaintiff and Scott also ensued.

43. Scott sought the opinion of Plaintiff on these general subject matters and Plaintiff expressed his opinion. At no time did Plaintiff discuss the specifics of his financial circumstances nor did Plaintiff seek or request that Scott disclose such information. Both Plaintiff and Scott discussed their general views about the market.

44. Plaintiff and Scott also engaged in a discussion about Plaintiff's future which would include a potential run for political office and the fact that Plaintiff is engaged in the writing of a book.

45. The following day, Scott was not present at the warehouse and Plaintiff was assigned to train with another associate in the Case Lot division, Joshua. Joshua and Plaintiff engaged in a general discussion on the same topics as those that Plaintiff and Scott had discussed.

46. Plaintiff, Scott and Joshua continued to engage in general conversations about topics that affect each every day. None of the discussions ever centered on a discussion about finances or about financial planning in any manner. Plaintiff expressed his opinion only on matters where his opinion was sought and his opinion was never sought on financial matters.

47. On or about February 9, 2017, Plaintiff was summoned to the office of John Murphy, the Human Resources Manager and Shanna Kanaps, the Operations Manager of the Case Lot division was present.

48. Murphy introduced himself along with Kanaps. Murphy opened the discussion by saying, "You are not in any trouble or anything and you are not being fired or losing your job." Murphy continued, "We just wanted to talk to you because several of the associates have been talking about you."

49. Murphy continued, "we have heard that you are running for a political office and that you are writing a book." Plaintiff responded that this was correct and that Plaintiff had shared this information with only Scott and Joshua. Murphy then asked, "What office are you running for?" Plaintiff stated, "I would rather not say as it is not relevant to now."

50. Murphy then stated, "Have you talked about finances in any way with any of the associates?" Plaintiff responded, "No, I have not." Plaintiff continued, "I have had general conversations about the economy, politics, and very general personal matters." Murphy then asked, "Have you done anything financially for anyone here…have you helped anyone?" Plaintiff responded, "I have purchased a plane ticket for Joshua so that he can see his sister whom he has not seen in 10 years."

51. Plaintiff then asked Murphy, "Is helping someone against the policy here?" Murphy responded, "No, you can use your own best judgment with that." Murphy continued, "We just wanted to talk to you and understand who you are because you seem to be somewhat of a celebrity

to the associates here." Murphy stated, "We haven't and don't usually have someone on the floor like you."

52. Murphy had some papers in his hand as he was speaking to Plaintiff. He then handed the papers to Plaintiff and asked Plaintiff, "Is this you or do you know this person?" Plaintiff asked for an opportunity to review the papers that Murphy had asked about.

53. Upon reviewing the papers handed to Plaintiff from Murphy, Plaintiff recognized the papers to be copies of a Forbes Magazine internet article written by Bill Singer and entitled, "Three Time Loser McDonald Sentenced in Hotel Scam." The article discussed the complaint and trial of Plaintiff in 2010 and gave details about Plaintiff's past, including the 2006 conviction.

54. Plaintiff asked Murphy why he was showing him this article and what relevance did it have to Plaintiff, and the job he was hired to do. Murphy responded, "I am asking about it because an associate gave it to me." "Murphy continued, "you are not losing your job." "We just wanted to talk to you."

55. Plaintiff then stated, "In full disclosure, I disclosed these convictions to the third party when I underwent the background check and I just want you to know that." Murphy responded, "Oh no, this isn't about that, we want you here and we want you to have a good experience and do a good job here." Murphy then stated, "We believe in second chances."

56. Murphy then ended the meeting by reiterating that Plaintiff was not losing his job and that Plaintiff could work at Wal-Mart for if he liked. Murphy then said to Plaintiff, "Well that's it and good luck on your future." The meeting then ended.

57. On March 7, 2017, Plaintiff was summoned to the office of John Murphy again. Present in the office was Matthew Mikesell, the Asset Protection Manager in the distribution center.

58. Murphy opened the meeting by stating, "Robert, we wanted to talk to you again about a few things." He continued, "You are not being fired or anything, we just need you to respond to these questions that we have here."

59. Plaintiff then responded, "what questions?" Murphy then stated, "These questions are in response to some convictions you had back in 2006." Plaintiff responded, "Why are you asking me about the 2006 convictions when I disclosed them to Sterling in the background check?" Murphy then responded, "Well, we are just following policy and need to have you answer these questions."

60. Plaintiff responded, "I am fine with answering questions, I just need to understand why I am answering questions about this." Murphy responded, "Well, let me read to you what I have here."

61. Murphy began to read from what appeared to be a letter which discussed the details of the 2006 convictions. When Murphy finished reading, Plaintiff explained that these convictions were combined for the purposes of sentencing and that they were explained in detail to Sterling,

the Third-Party background check company. Plaintiff further explained that he had a copy of the report to support his position.

62. Murphy then asked, "Where is the report?" Plaintiff responded, that the report was at Plaintiff's home and that Plaintiff would be glad to provide a copy of the report to them. Plaintiff then asked to see the letter that Murphy was reading from.

63. Murphy handed the letter to the Plaintiff. Upon review, the letter contained the markings of the Walmart Global Security Department and Plaintiff read the letter. The letter appeared to be a letter in email form to John Murphy, but was written as if it was addressed to the Plaintiff.

64. The letter opened by saying that Plaintiff had applied for a position with Wal-Mart that was related to the Asset Protection Division and had been found to be "not competitive." The letter stated that Plaintiff had appeared to falsify his application by failing to disclose the 2006 convictions.

65. The letter was concerning for the following reasons: (1) Plaintiff had not applied for another position within Walmart and certainly not within a division of Walmart that would have implicated the APD; because Plaintiff had already considered how his conviction might affect certain jobs and specifically did not apply for any job that would have or could be determined to be reasonably related to the prior convictions.

66. As a first-year law student, Plaintiff had researched the laws in the State of Wisconsin prior to applying to Walmart and any other employer in Wisconsin to understand the impact of convictions relating to employment opportunities.

67. (2) Plaintiff had fully disclosed the convictions to Sterling, the Third Party which conducted the background check and the disclosures appeared in the actual report that was done by Sterling, the Third Party and sent to Plaintiff.

68. Given these realties and verifiable facts, Plaintiff stated to Murphy, "These statements are not true, I fully disclosed the convictions to Sterling, the Third Party and I certainly did not apply for another job within Walmart." Plaintiff reiterated, "These statements are false and not true." Plaintiff then asked Murphy, "Why would this letter contain these obvious false statements.?" Murphy responded, "Oh well, this is just a general statement, it always says that." Plaintiff responded, "This cannot be accurate and your statement doesn't make sense."

69. Murphy then stated, "Well, if you just answer the questions that they have asked on this form and explain what you have told us, then this should all be fine." Plaintiff agreed, but asked Murphy if he could wait before sending in the information because Plaintiff wanted to provide proof that he had in fact disclosed the convictions and wanted to provide proof of his enrollment in law school and business school. Murphy agreed. In response to the request, Murphy stated, "Yeah, you should bring that, because I don't think anyone would believe you without it."

70. After leaving the meeting with Murphy, Plaintiff placed a call to a legal advisor and discussed the meeting with the advisor. On advice of the legal advisor, Plaintiff prepared a discriminatory complaint to be filed with the Equal Rights Division at the State of Wisconsin's Department of Workforce Development.

71. Plaintiff was also advised to not provide a physical copy of the Sterling Third-Party Report, but to show John Murphy a copy of the report the next day. It was the opinion of counsel, that Wal-Mart had falsified the application for an additional job as a pretext to discrimination based on the internet article that John Murphy had obtained.

72. It was counsel's further opinion that Walmart was already aware of the 2006 convictions because they included them in the letter that was reportedly addressed to Plaintiff about a job that Plaintiff had not applied for.

73. On the following day, March 8, 2017, Plaintiff filed the discriminatory complaint with the Equal Rights Division alleging that Wal-Mart, through John Murphy had discriminated against Plaintiff based exclusively upon his conviction record and that John Murphy had in fact used the Forbes Article as a pretext to do so.

74. Later in the afternoon, on March 8, 2017, Plaintiff arrived at work for his regular shift. Plaintiff had the information that he had requested from his law school and business school as well as the original copy of the Sterling Infosystems Background Check Report sent to Plaintiff. Plaintiff went to see John Murphy with the information.

75. Upon entering Murphy's office, Plaintiff presented Murphy with the information, first handing him the verification of enrollment for law school and business school. Plaintiff then presented Murphy with the Background Check Letter from Sterling. Plaintiff went through the letter with Murphy and specifically showed Murphy that the 2006 convictions had been disclosed and that they were contained in the report exactly as Plaintiff had stated.

76. Murphy then stated, "You are exactly right, its right here in black and white." Murphy continued, "I am not sure why they are saying this?" Plaintiff then asked Murphy, "Who are you referring to?" Murphy responded, "the Walmart Vetting Team."

77. At that point, Plaintiff handed Murphy an additional statement to be provided with the documents Murphy had said that he needed to send out. The statement handed to Murphy contained (1) the denial that Plaintiff had failed to disclosed the 2006 convictions; (2) the denial that Plaintiff had submitted a second application and (3) informed that Plaintiff had filed the discriminatory complaint.

78. Murphy then stated, "Why are talking to a lawyer?" He continued, "You don't really need to pay a lawyer, with this information, everything should be okay."

79. Murphy then stated, "I don't know why you need to file a complaint." Plaintiff responded, "I have sought the advice of counsel and I believe that what has happened is a

discriminatory practice in violation of the law." Murphy was visibly frustrated and stated, "Okay is that all." The meeting ended and Plaintiff returned to work.

80. On March 9, 2017, at about 10:30 am, Plaintiff received a call from John Murphy. On the call, Murphy stated, "Unfortunately, I must tell you that you are suspended, with pay." Plaintiff responded, "Why am I being suspended?" Plaintiff continued, "I just had three or four meetings and assurances from you that I was not losing my job and that nothing was going to happen to me and now, all of the sudden, I am suspended?" Murphy responded, "Look, I just want to make sure you understand that you are suspended with pay."

81. Plaintiff responded, "I understand that, but what I don't understand is why I am being suspended in face of several assurances from you that I would not lose my job." Murphy responded, "Well you are the one who started this with filing the complaint, making this legal." The call ended shortly after that.

82. Plaintiff immediately called the Equal Rights Division and the Equal Employment Opportunity Commission. Plaintiff also researched the Federal Labor Standards Act and consulted its anti-retaliation provision and the retaliation provision of Title VII. After this research, Plaintiff filed a retaliation claim with the Equal Rights Division and the Equal Employment Opportunity Commission on March 9, 2017.

83. On March 10, 2017 at about 9:14 am, Plaintiff received an email from Wal-Mart requesting that Plaintiff provide authorization for a background check because Plaintiff had received a conditional offer of employment. Plaintiff did not authorize the background check.

84. On March 10, 2017 at about 9:32 am, Plaintiff received an email from Wal-Mart requesting that Plaintiff provide authorization for a background check because Plaintiff had received a conditional offer of employment. Plaintiff did not authorize the background check.

85. On March 10, 2017 at about 9:32am, Plaintiff received an email from Wal-Mart requesting that Plaintiff provide authorization for a background check because Plaintiff had received a conditional offer of employment. Plaintiff did not authorize the background check.

86. Plaintiff received three separate emails from Wal-Mart's vetting team to consent to a background check for an alleged position that Plaintiff had applied for and received a conditional offer for, yet Plaintiff had never applied for any other position within Wal-Mart.

87. The email from Wal-Mart on March 10, 2017 confirmed the conclusion that counsel had suggested on March 7, 2017, that Wal-Mart had generated a false application as a pre-text to discriminate against Plaintiff based on the Forbes Article that John Murphy had obtained, as he says, "from another associate."

88. The email from Wal-Mart on March 10, 2017 also confirms that the letter John Murphy had showed to Plaintiff in his office was also falsified by Wal-Mart when it stated that Plaintiff had applied for another job in the Asset Protection Division.

89. Additionally, the letter stating that Plaintiff had applied for another job within Wal-Mart is also falsified by Wal-Mart because Plaintiff consented to a background in December when he was found competitive for the Orderfiller job. Plaintiff was subjected to the background check, disclosed all convictions and was found competitive. Plaintiff began working on January 25, 2017.

90. Plaintiff placed a call to the Wal-Mart Vetting team at the 800-number contained in the email. A vetting team associate came on the line and Plaintiff discussed the background check email with that associate.

91. During the call with the associate, Plaintiff asked why he was being asked to submit to second background check when he had not applied for another job within Wal-Mart and that Plaintiff was already an employee of Wal-Mart since January 25, 2017.

92. The associate stated that the email was "likely" a mistake and that the emails often are sent in error. She asked Plaintiff to remain on the line while she "checked the system." The associate soon came back on the line and stated, "Everything looks fine the system." Plaintiff ended the call.

93. After speaking to the associate, Plaintiff placed a call to John Murphy at the Distribution Center. Murphy came onto the line and a conversation began.

94. Plaintiff informed Murphy that he had received an email for a background check because he had been offered a new position. Murphy stated that Plaintiff needed to consent to the background check so the process could proceed. Plaintiff asked, "What process are you referring to." Murphy responded, "The investigation regarding the failure to disclose the 2006 convictions."

95. Plaintiff then responded, "You never told me that there was an investigation and the investigation would be moot because I provided clear evidence that I did not fail to disclose the 2006 convictions." Murphy responded, "Well you need to do it anyway." Plaintiff responded, "Can you tell me the job that I supposedly applied for and for which this background check is for?" Murphy responded, "Look, you just need to do the background check."

96. Plaintiff responded, "I cannot consent to a background check for an application I have no idea was filed and which was not filed by me and you can't give me proof that I applied for another job, I therefore cannot consent to this background check." Murphy insisted and Plaintiff declined.

97. On March 14, 2017, at 1:06 am, Plaintiff received a fourth email stating that he had been offered conditional employment with Wal-Mart and that Plaintiff should consent to the background check. Plaintiff declined because Plaintiff had not applied for a job within Wal-Mart and the email confirmed yet again that Wal-Mart had falsified an application on behalf of Plaintiff.

98. Later in the afternoon on March 14, 2017, John Murphy again phoned Plaintiff and asked him to consent to the background check. Plaintiff again asked why. Plaintiff and Murphy engaged in a discussion about what was happening to Plaintiff.

99. Murphy had no reasonable explanation for what was happening. Murphy stated that he was following Wal-Mart policy. Plaintiff then asked Murphy to point him to the policy that Wal-Mart was following so that Plaintiff could read it. Murphy stated that he was not authorized to talk to Plaintiff about the policy. Murphy's response was both odd and foolish. Plaintiff was still an employee of Wal-Mart and presumably, if this policy existed, a current employee would be entitled to review it.

100. Plaintiff asked Murphy if he understand that his action along with Wal-Mart's was discriminatory given that Plaintiff was suspended after he told Murphy that he had filed a complaint and that the application was false and a pre-text to discrimination.

101. Plaintiff further stated to Murphy that it was Murphy who had used the Forbes Article as a pre-text to launch the investigation, that Plaintiff was not aware of any application and that the application allegedly filed was falsified by Wal-Mart to achieve an illegal purpose. Murphy did not deny these statements instead, stated, "I just can't talk about it." The call shortly ended.

102. On March 15, 2017, at 11:30am Plaintiff received a call from John Murphy. During the call, Murphy stated, "Unfortunately, I have to tell you that your employment has been terminated." Plaintiff asked why? Murphy had no reasonable explanation. Murphy stated, "Well it's because you would not consent to the background check."

103. Plaintiff then responded, "I did not apply for another job within Wal-Mart." Plaintiff continued, "I submitted to and completed a background check for the job that I applied for and was found to be competitive, so I could not have refused to comply with a background check request." Plaintiff stated, I provided indisputable evidence that I did in fact disclose the 2006 convictions."

104. Murphy responded, "Look, I am sorry, I think you have been honest and up from with me." Murphy continued, "I have no reason to think otherwise and you did produce evidence to support your position." Plaintiff stated, "Then why am I being terminated." Murphy responded, "Look, I am just doing what I am told." Plaintiff asked, "Who told you to do this?" Murphy responded, "Wal-Mart, corporate."

105. Murphy continued, "I received a call from corporate and I was told that I had to call you and terminate your employment." Plaintiff then ended the call.

106. After the call, Plaintiff filed a third discriminatory complaint alleging additional retaliation for the termination that followed.

107. On March 20, 2017, Plaintiff received in the mail a copy of a document entitled "Wal-Mart Stores, Inc Exit Interview."

108. The Exit Interview Form stated that the Plaintiff was Involuntarily Terminated and stated that the Termination Reason was Gross Misconduct-Other.

109. The form was not signed by Plaintiff because Plaintiff was not asked to participate in an exit interview.

110. Plaintiff had not been told that he had committed any type of misconduct much less gross misconduct. The reasons stated for termination were the first-time Plaintiff had ever heard of Gross Misconduct as the reason for termination.

111. The exit interview does not identify the gross misconduct.

112. Wal-Mart, through John Murphy violated the federal Fair Labor Standards Act by retaliating against Plaintiff because he filed a discriminatory complaint with the Equal Rights Division of the Department of Workforce Development in the State of Wisconsin.

113. Wal-Mart, through John Murphy suspended Plaintiff after Plaintiff informed John Murphy that he had filed a discriminatory complaint with the Equal Rights Division.

114. Wal-Mart, through John Murphy terminated Plaintiff's employment after Plaintiff informed John Murphy that Murphy's use of the Forbes Article was a pre-text to discrimination and that Wal-Mart had falsified an application in Plaintiff's stead to accomplish the discrimination.

115. Wal-Mart, through John Murphy's own admission retaliated against Plaintiff because Plaintiff filed the discrimination complaint.

116. Wal-Mart's retaliation is evident because of the proximity of the events.

117. John Murphy stated that he received the Forbes Article from an associate on February 9, 2017, two months after Plaintiff had been employed.

118. Murphy asked Plaintiff to confirm that the Forbes Article was indeed about Plaintiff.

119. Plaintiff confirmed that the Forbes Article was written about him.

120. Three weeks later, on March 7, 2017, Murphy summoned Plaintiff to his office to inform Plaintiff that he had failed to disclose the 2006 convictions and that this was discovered because Plaintiff had applied for another position within Wal-Mart.

121. March 8, 2017, Plaintiff denied failing to disclose the 2006 convictions, denied filing an application for another job and informed John Murphy that he had filed a discriminatory complaint with the Equal Rights Division.

122. March 9, 2017, John Murphy calls Plaintiff and suspends Plaintiff telling Plaintiff that he is suspended because Plaintiff is the one who filed the complaint and made it a legal matter.

123. March 10, 2017, Wal-Mart sends three emails for background check authorizations on conditional job offers that Plaintiff never applied for and after Plaintiff was suspended.

124. Mach 14, 2017, Wal-Mart sends an additional email requesting a background check authorization on a conditional job offer that Plaintiff had not applied for.

125. March 15, 2017, Wal-Mart instructs John Murphy to terminate Plaintiff's employment.

126. Plaintiff engaged in a protected activity.

127. The Wisconsin Fair Employment Law, Sections 111.31-111.397 prohibits discrimination against an employee based on a conviction record. The Wisconsin Fair Employment Act is a statutory law enacted by the Wisconsin State Legislature.

128. Plaintiff has a conviction record and therefore is a member of a protected class under the Wisconsin Fair Employment Act. The filing of the discriminatory complaint on March 8, 2017 is therefore a statutorily protected activity.

129. Wal-Mart, through John Murphy used the Forbes Article to discriminate against Plaintiff based on his conviction record.

130. After learning of the falsified application from John Murphy that was filed by Wal-Mart and the falsified statements that Plaintiff had failed to disclose the 2006 convictions, Plaintiff produced evidence to the contrary to John Murphy and denied filing an application for employment and denied failing to disclose the 2006 convictions.

131. Plaintiff then filed a discriminatory complaint with the Equal Rights Division on March 8, 2017 and directly informed John Murphy of the filing of the complaint both by letter and in a face to face meeting in his office.

132. Wal-Mart, through John Murphy suspended Plaintiff the very next day, March 9, 2017.

133. The filing of the discrimination complaint with the Equal Rights Division and John Murphy's direct knowledge of that filing constitutes a protected activity under the FLSA.

134. Plaintiff suffered two adverse employment actions.

135. The first adverse employment action suffered by Plaintiff is the suspension on March 9, 2017.

136. The second adverse employment action suffered by Plaintiff is the termination on March 15, 2017.

137. There is a causal link between the protect activity and the adverse employment actions.

138. John Murphy's meeting on February 9, 2017 was for inquiring into Plaintiff's conviction record by asking Plaintiff to confirm that the Forbes Article was about Plaintiff. The Forbes Article contained information about the 2006 conviction.

139. Shortly after Plaintiff confirmed that the Forbes Article was about Plaintiff, John Murphy summoned Plaintiff into his office on March 7, 2017 to discuss the 2006 convictions which were mentioned in the Forbes Article.

140. John Murphy also presented a letter to Plaintiff that stated that Plaintiff had failed to disclose the 2006 convictions and that Plaintiff had applied for a job within Wal-Mart that triggered another background check.

141. On March 8, 2017, in John Murphy's office Plaintiff informed Murphy that a discrimination complaint was filed.

142. On March 9, 2017, John Murphy called Plaintiff to tell Plaintiff that he was suspended because he filed a discrimination complaint and that it was the Plaintiff wo made this a legal issue.

143. After Wal-Mart sent several requests for background checks based on an application which was never filed by Plaintiff, Wal-Mart terminated Plaintiff.

144. Wal-Mart terminated Plaintiff in retaliation for not completing the background checks based on the false application and the false statement prepared by Wal-Mart that Plaintiff had not disclosed the 2006 convictions.

145. The exit interview form also demonstrates the causal link between the protected activity and the adverse employment action.

146. The exit interview states that the reason for termination was gross misconduct and specifies the word "other" next to it.

147. Wal-Mart does not present any evidence of gross misconduct from Plaintiff's actual work, accordingly, the only misconduct that Wal-Mart can possibly be referring to is what John Murphy read from the Forbes Article.

148. Plaintiff worked at the Distribution Center from January 25, 2017 until March 9, 2016. During that time, Plaintiff threw approximately 30,000 cases with only two errors.

149. Plaintiff's immediate manager, Jacob Ohman provided Plaintiff with a printout of his performance from the JDA system on March 7, 2017 and the report demonstrated that Plaintiff had outperformed the minimum requirements in his training.

150. Jacob Ohman, when informing Plaintiff about of about one of the two errors stated, "This is an error that you made last week, it's the only one that I have." He continued, "You are doing well, great actually, because usually we see many more errors from new hires in their first few months."

151. Plaintiff therefore had no performance issues or problems and was performing his job responsibility well.

152. John Murphy on at least three occasions assured Plaintiff that he was not losing his job, first on February 9, 2017, then on March 7, 2017, and again on March 8, 2017.

153. John Murphy, on at least two occasion assured Plaintiff that he was not in any trouble, first on February 9, 2017 and then on March 8, 2017.

154. Given these facts, John Murphy's obtaining the Forbes Article served as the pretext that set the discrimination acts in motion.

155. Murphy then used the Forbes Article to initiate an internal investigation by Wal-Mart Global Security though the Wal-Mart Vetting Team. Wal-Mart then falsified an application that was specifically related to a position that required an assessment from the Asset Protection Division, hence the involvement of Matthew Miskell, the Asset Protection Manager.

156. Wal-Mart then prepared an email purportedly addressed to the Plaintiff in which it states that Plaintiff applied for a job position that triggered a new background check, not by the third party, Sterling, but by Wal-Mart itself.

157. Wal-Mart claimed that the Plaintiff failed to disclose the 2006 convictions, yet Wal-Mart had specific knowledge of the 2006 convictions as they were listed in the letter that John Murphy produced to Plaintiff on March 7, 2017.

158. Wal-Mart could have only received the information about the 2006 convictions from one of two sources, first, the Sterling Background Check report where the information was contained because it was revealed to Sterling by Plaintiff or second, Wal-Mart conducted a background check without the authorization of the Plaintiff.

159. Wal-Mart then sought the approval of Plaintiff to consent to a background check, after it had already prepared a report that contained the very conviction it claimed was not disclosed.

160. These acts were a result of John Murphy's confirmation that Plaintiff was the subject of the Forbes Article. These acts were the pre-text to the discriminatory action which led Plaintiff to file the discriminatory complaint.

161. After Plaintiff made it clear to John Murphy that Plaintiff had filed a discriminatory complaint based upon these acts, Wal-Mart, through John Murphy retaliated against Plaintiff the very next day by suspending Plaintiff.

162. The retaliation was confirmed by John Murphy in his conversation with Plaintiff initiating the suspension when Murphy told Plaintiff that it was Plaintiff's fault that Plaintiff was being suspended because Plaintiff filed the discriminatory complaint and made it a legal situation.

163. Plaintiff was further retaliated against when he was terminated.

164. The termination had no basis in fact, reason or truth.

165. Wal-Mart, through John Murphy, Shanna Kanaps and Matthew Mikesell acting as agents for Wal-Mart, retaliated against Plaintiff by suspending and ultimately terminating Plaintiff because he filed a discriminatory complaint.

166. Plaintiff committed no gross misconduct against Wal-Mart.

167. Wal-Mart produced no evidence that Plaintiff committed gross conduct against it.

168. John Murphy provided Wal-Mart with a Forbes Article that was written five years ago, about a conviction that happened seven years ago, and which referred to a conviction that occurred more than eleven years ago, and had no bearing on the job that Plaintiff had appropriately secured.

169. As alleged in this complaint, Wal-Mart, through John Murphy, Shanna Kanaps and Matthew Mikesell, acting as agents of Wal-Mart illegally and unlawfully retaliated against Plaintiff by suspending Plaintiff and ultimately terminating Plaintiff in violation of the Fair Labor Standards Act, Section 215(a)(3).

170. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of he filed a discrimination complaint, in violation of the fair Labor Standards Act, Section 215(a)(15).

171. Wal-Mart's retaliation against Plaintiff was intentional and is an unlawful employment practice.

172. The retaliation complained of above was done with malice and/or reckless indifference to the federally protected rights of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court:

A. Grant a permanent injunction enjoining Wal-Mart, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any unlawful retaliation employment practice that violates the Fair Labor Standards Act anti-retaliation provision, Section 215(a)(3);

B. Order Wal-Mart to institute and carry out policies, practices, and programs which eradicate the effects of its past and present unlawful retaliation employment practices;

C. Order Wal-Mart to make Plaintiff whole by providing appropriate back pay with prejudgment interest, in amounts to be proved at trial, and other affirmative relief, including but

not limited to rightful place reinstatement, necessary to eradicate the effects of its unlawful retaliation employment practices;

D. Order Wal-Mart to make Plaintiff whole by providing compensation for past and future pecuniary losses;

E. Order Wal-Mart to make Plaintiff whole by providing compensation for past and future non-pecuniary losses, including but not limited to, emotional pain, suffering, loss of enjoyment of life and humiliation;

F. Order Wal-Mart to pay Plaintiff punitive damages for its intentional, malicious and/or reckless conduct, in an amount to be determined at trial;

G. Grant such further relief as the Court deems necessary and proper; and

## LEAVE TO AMEND

Plaintiff request leave to amend this Complaint where appropriate.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all issues of fact raised by his complaint.


Respectfully submitted,

*[signature]*

Robert Carter
Eau Claire, Wisconsin

March 27, 2017